## HEALEY *v.* TOPPAN.

A specific bequest of particular articles of personal property, which perish in the using, such
as corn, wine, hay, &c., to one person for life, with remainder over, vests the whole proper-
ty and title in such articles in the tenant for life, provided he live to consume them.

But if the tenant for life should die before these specific articles are consumed, whatever should
remain unconsumed at his decease would go to the remainder-man and not to the heirs of
the tenant for life.

When there is a specific bequest to one for life, with remainder over, of particular articles of
personal property, which do not perish with the using, but are only liable to be worn out
and deteriorate in value, such as household furniture and farming utensils, then the tenant
for life only takes the use, and the remainder-man has a good title in reversion.

In such a case, the tenant for life will be entitled to the possession and use of the specified
property, and he will not be required to give any security for the property to the remainder
man, but will only be required to file an inventory of the property for the benefit of the re-
versioner.

But, in a case of that kind, the remainder-man may have a remedy in equity to prevent any
wanton waste or destruction of such property, or to prevent its fraudulent concealment or
removal.

Where a bequest of personal property is not specific, but is a general gift of all the testator's
property, or of the residue of it all, generally to one person for life, with remainder over,
and when such general bequest includes perishable property, the object of the testator can
only be effected by converting such perishable property into permanent securities, and giv-
ing each person in succession the dividends or interest of the fund.

This is the general rule applicable to such cases of general or residuary bequests of all a tes-
tator's property, and it will be applied in all cases, unless there can be gathered from the
will some expression of intention, on the part of the testator, that the property is to be en-
joyed *in specie;* which intention, it is incumbent on those contesting the application to the
rule to point out; and the mere absence of any direction to convert the property, will not be
sufficient.

A bequest or devise of *real estate* for life, with remainder over, is always to be treated as a
*specific* devise, of which the tenant for life is to have the possession, use, and income during
life; and it makes no difference whether such a devise is, in form, specific or general or res-
iduary.

But there is nothing in the fact that real and personal estate are bequeathed together, at the
same time, and in the same general or residuary bequest, that tends to show that the testa-
tor intended that the personal property, or any part of it, should be enjoyed *in specie* by
the tenant for life.

Where a testator, after some specific bequests, makes a general residuary bequest of all his
property to one for life, with remainder over, and his estate consisted of lands, cash on hand,
stocks in various corporations, notes, and shipping, *held* that the shipping should be con-
verted into money by the executors, and the avails, with the cash on hand, invested in per-
manent securities, so that the income to the tenant for life and the remainder-man may be
equal by the year.

In such a case, where it appeared that the whole amount of shipping, as appraised, was some
$30,000, and that the profits or income of the same, for eighteen months during the set-
tlement of the estate, had been some $18,000, or about 40 per cent. per annum, *held* that
the tenant for life was not entitled to all his income or profit, but that the same was, to-
gether with the avails of the shipping when sold, to be treated as capital, and invested, af-
ter paying the tenant for life a reasonable amount, as interest on said sum during the pro-
cess of administration.

And so, a personal annuity, not to commence in enjoyment for twenty years from the death of
the testator, should, for the sake of the tenant for life, be converted into a present interest,
in order to yield an immediate income, so that the interest of the tenant for life and the re-
mainder-man may be equal by the year.

When a residuary bequest is made to one, "subject to" the payment of a certain annuity to
another for life, it is equivalent to charging that annuity upon the property bequeathed for
the life of the annuitant; and, before the property should be delivered to the legatee, enough
of the property should be set aside and invested by the executor, so that its income will be
sufficient to pay the annuity, or the legatee should give the executor other sufficient securi-
ty for the payment of the annuity.

In case of a residuary bequest of personal property to one for life, with remainder over, in the
absence of any other provision, the executors will be held to be trustees, for the purpose of

converting all perishable property into money and investing it in permanent securities, so as to equalize the income of the tenant for life and the remainder-man.

Five per cent. per annum upon the clear residue of principal or capital as finally ascertained, will be a reasonable annual interest or income to be paid to the tenant for life, during the process of administration, to be computed from the death of the testator.

THIS is an appeal from the Court of Probate. Charles N. Healey, the plaintiff, and Mrs. Ann E. S. Toppan, the defendant, were appointed joint executors of the last will and testament of Christopher S. Toppan, late of Portsmouth, deceased, and had accepted the trust and given the required bonds. The estate had been appraised as follows :

| | | |
|---|---|---|
| Hampton farm, | $5,000 00 | |
| Real estate in Portsmouth, | 966 00 | |
| Total real estate, | | $5,966 00 |
| | | |
| Cash on hand, | $3,532 66 | |
| Stock in trade (shipping,) | 29,750 00 | |
| Stock in corporations, | 51,288 00 | |
| Notes, &c., | 1,961 62 | |
| Live stock and provisions, | 578 00 | |
| Farming utensils, | 75 00 | |
| Furniture at Portsmouth, 3000, ⎱ | | |
| Furniture at Hampton,      300, ⎰ | 3,300 00 | |
| Miscellaneous, | 300 00 | |
| Total of personal property, | | $90,785 28 |
| | | |
| Total, | | $96,751 28 |

It appeared that the income upon the shipping had been near $18,000 ; that one vessel had been lost and the insurance upon it obtained ; and that certain railroad bonds appraised at $9600, had been sold at an advance of over $8000 above the appraisal.

The Hon. Christopher S. Toppan died October 1861, leaving a will from which the following are extracts :

"In the Name of God, I, Christopher Stephen Toppan, of the City of Portsmouth, in the County of Rockingham and State of New Hampshire, Merchant, considering the uncertainty of this mortal life, and being of a sound mind, blessed be the Almighty God for the same, do make and publish this my last Will and Testament, in the manner and form following : That is to say, *First*, I give and bequeath unto my beloved wife Ann Elizabeth Salter Toppan, all of my property in possession, and all and every contingent interest arising or growing out of any property now in my possession or in expectancy, subject to the following and all the conditions that may be and are named in this Will and Testament, namely :   The sum, six hundred dollars, each and every year, shall be paid by my wife semi-annually, if convenient, to my sister Mary Chase Toppan, of Hampton, and Sarah Jane Parker Spaulding, wife of the Reverend Doctor Samuel Spaulding, now of Newburyport, conjointly,

during their natural lives, and in case of the death of either sister, then the said sum of six hundred dollars to be paid to the survivor during her life.

The Second condition is, that after the death of my wife one-half of all of my property shall be held in Trusteeship, the Trustees to be named hereafter, for the benefit of all the persons who shall or may be interested in the disposal thereof, and the said property shall be disposed of as follows, namely :   Christopher Grafton Toppan during his natural life shall have the benefit, profits and sole use of all my Real Estate, with the buildings thereon in the Town of Hampton, and after his decease, I bequeath the said Real Estate to his son who shall bear my name, and if at his death he should leave no male heir, the said property shall be given to the Academy at Hampton, for the benefit of that Institution, never to be sold by them, but to be continually kept in order and repair, that an income may be realized for the benefit of the Academy each and every year, and, if it should be the case that there is no Academy, or had been for the term of two years in Hampton at the time of said Christopher Grafton Toppan's death, then this said property shall be at the disposal of the Congregational Society for religious worship in Hampton, who hold their services in a church opposite to my land, near the Town House, on the road leading towards the sea.   The remainder of my property being personal, with some Real Estate situated in the City of Portsmouth, the income arising therefrom shall be equally divided and paid to all of my nephews and nieces, yearly, so long as they or any of them may live, and the last survivor of them shall be the receiver of all the property held by my Trustees for their account.

*Secondly*, If my debts, when paid should diminish my property to such an extent that it cannot produce sufficient income for the support of my wife and the payment of the said sum of six hundred dollars annually, for the support of my sisters, as stated in the first article of this will, then this annual payment shall cease altogether, provided my wife's income or means only shall be in amount of the sum of five hundred dollars, exclusive of house rent.   And in case that my property shall produce an income exceeding the sum of five hundred dollars and the house rent, the sum of six hundred dollars shall be paid annually, in proportion to the whole amount as the said property shall produce, and not otherwise.

*Thirdly.*   In estimating my property as herein set forth, all the furniture, fixtures, silver ware, jewelry, watches, clothing, appurtenances, carriages and horse, if any I own in the city of Portsmouth, cows and oxen, live stock and farming utensils, either at Hampton or Portsmouth, and any property on my place at Hampton, either in the house, barns, corn-house, wood-house, or sheds, or in any of the out-houses, considered as personal property, shall be my wife's for her sole use and benefit, and this property shall not be deemed and taken into the account, unless it be very necessary to enumerate it with my other property in order to pay my debts and the income to my sisters.

*Fourthly.* If in the event, the whole appraised property of which I am possessed at my death, should exceed the sum of fifty thousand dol-

lars, after my debts are paid or provided for, then I do hereby ordain that the sum of two thousand dollars, be set apart, and the same paid to the Trustees of the Hampton Academy, &c.

(Here follow specific directions concerning this legacy.)

*Sixthly.* I hereby ordain and do hereby decree, that if there should be an excess over the sum that is named in the fifth article of the will, and the first two thousand dollars having been paid accordingly, that there be one thousand dollars paid to the Portsmouth Atheneum, &c.

*Seventhly.* For the love and good will which I have for my niece, Sarah Parker Toppan Healey, I give and bequeath to her sole use and benefit, the sum of Five hundred dollars, and this said bequest be paid to her at any time within two years after my death, from any property that I may own, and in case this bequest should never be received by my niece from my estate, then the said bequest shall be given to her oldest child.

*Eighthly.* In accordance with the second condition of this will, I hereby appoint as Trustees to manage, govern, and direct the funds that may come into the possession of the Trustees, my nephew Mr. Charles Healey, of Stratham, and William H. Hackett, Esquire, of Portsmouth, and in case of the death of either of these persons, the vacancies to be filled by my nephews and nieces, and all vacancies that may arise after my appointments of them by this will, shall be filled by my nephews and nieces, if of age, if not, by their respective Guardians. It is here understood, that in this Trusteeship, the Trustees of whatever appointment, shall not receive any salary or commission for the transaction of the business of the Trusteeship, but they shall be content with having their expenses paid with any love and good will they bear for their friends, as or being full compensation for their services as a Trustee of this Fund, set apart for my nephews and nieces, &c."

The testator nominated the appellant, C. N. Healey, and his wife, A. E. S. Toppan, to be executors of his will, and they accepted the trust. They returned an inventory of certain real estate, stocks, ships, and other articles, the property of the deceased. At the May Term of the Probate Court in this county, the two executors, who, up to this time, had transacted all the business of the estate through a common agent or attorney, each presented an account of their joint administration, agreeing that the same shall be settled as the Sup. Ct. of Probate may finally order.

The defendant, Mrs. Toppan, as executrix, presented an account in the name of both executors, charging them (1) with the amount of the inventory of the personal estate, (2) with sundry debts, &c., collected; and claiming allowance (1) for the payment of debts, legacies, &c., (2) for certain losses and the expenses of administration, and (3) claimed all the balance as paid or payable to the said Ann E. S. Toppan, widow of the deceased, according to the will.

At the same time the said Healey presented an account of the joint administration in the name of both executors, charging them (1) with the amount of the inventory of the personal estate, (2) with sundry debts collected, (3) with dividends of stocks, income of ships, and rents

of real estate accruing since the decease of the testator; and claiming allowance (1) for the payment of debts, legacies, &c., (2) for the losses and expenses of administration aforesaid, and prayed the order of the Judge of Probate:

(1) Whether the shipping appraised at $29,750, and the earnings and proceeds thereof, should be transferred to the testator's widow, as it now exists, or whether it should be turned into money, and transferred to her as capital to be invested in fulfillment of the trust created by the will?

2. Whether the executors should pay over to the widow of the testator the balance in their hands, with or without her giving surety to the Judge of Probate to fulfill these trusts upon which said property was devised to her?

The Judge of Probate, by his decree made the 10th day of June, 1863, allowed the account as presented by the widow, and directed the executors to settle the same accordingly.

The said Healey presented to the Judge of Probate, before the decree above named, a paper, upon which the Judge made decree, which paper and decree are as follows:

STATE OF NEW HAMPSHIRE—Rockingham, ss.

COURT OF PROBATE, PORTSMOUTH, MAY 12, 1863.

In the matter of the settlement of the Estate of the late Hon. Christopher S. Toppan, and of the several accounts presented by each of the Executors, Ann E. S. Toppan and Charles N. Healey:

Both of the executors having presented to this Court the account of administering the estate of said Christopher S. Toppan, deceased testate, stated upon the basis which they respectively believe to be correct, and differing from each other in several particulars, and as doubts have arisen as to the true legal import of some parts of the will of said deceased, herewith presented to this Court, Charles N. Healey, one of the executors of the will of said deceased, prays the direction, order and decree of this Court as to the following matters:

I.    Is the account rendered by either of the executors stated upon the proper basis, if yea, which? If neither of the accounts are stated on a right basis how should the account be stated?

II.    As touching the shipping interest, and any other personal property of a like character whose value consists in their use and consumption, and not given to the testator's widow absolutely, and comprising a part of the balance in their hands, is it the duty of the executors to turn that kind of property into money and pay the proceeds over to the widow of the testator, or should they transfer the shipping and other similar property, if any, to her as it now exists?

III.    As touching the property given by the testator to his widow, upon certain conditions and trusts, should the executors transfer this property to his widow unconditionally and as her property, or in trust, or should she give any, and if any, what, security for the fulfillment of the several trusts upon which such property was given her?

IV.   Or is it the duty of the executors to retain any part, and, if so, what part, of the balance in their hands subject to trust for the purpose of securing the fulfillment of the trusts created in and by said will?

V.   If the shipping interest is all to be transferred to the testator's widow, is it the duty of the executors to take any measures, and, if any, what, to secure the repairs or renewal of the ships or to preserve the capital invested therein?

CHARLES N. HEALEY, Executor,<br>By his Attorney, W. H. Y. HACKETT.

STATE OF NEW HAMPSHIRE—Rockingham, ss.

At a Court of Probate held at Exeter, in said County, on the tenth day of June, A. D. 1863:

The foregoing paper was presented to me, the Judge of Probate for said County, by Charles N. Healey, one of the executors of the last will of Christopher S. Toppan, deceased, upon the settlement of the account of the executors of said will, and has been considered by me. The Court has allowed the account as drawn up and presented by Ann E. S. Toppan, the other executor of said will, and are of opinion that the widow of said deceased is entitled to the possession of all the personal estate of said deceased by virtue of his last will; that the Probate Court have no power to order the executors to convert the shipping interest or any property of that kind into money, and pay the proceeds over to said widow, but that the widow is entitled to the possession of all the personal property, and that the executors or the Probate Court have no right to require her to give any security for the same.

WM. W. STICKNEY, Judge of Probate.

From the decree of the Judge of Probate the said Healey appeals as follows:

And now Charles N. Healey, one of the executors of the will of said C. S. Toppan, being aggrieved by the foregoing decree, order, grant, and denial, hereby appeals therefrom to the Supreme Judicial Court next to be holden at Exeter, within and for the first Judicial District on the third Tuesday of June 1863, and here sets forth his interest therein and his reasons therefor:

1.   As one of the executors he has an interest in and a responsibility for the due execution of the will of said testator and of the several trusts therein created, and the foregoing decrees and denials, grants and orders, tend to defeat or endanger such due execution of said will.

2.   Because the Judge of Probate has ordered the shipping of the testator to be transferred to his widow, instead of the money for which said shipping could be sold.

3.   Because the Judge of Probate has ordered the entire balance in the hands of the executors to be paid to the widow of the testator without requiring her to give any security for the fulfillment of the several trusts upon which said property was devised.

CHARLES N. HEALEY,<br>By his Attorney, W. H. Y. HACKETT.

*W. H. Y. Hackett,* for plaintiff.

Guided by the rule, that the intention of the testator, as gathered from an examination and consideration of the whole instrument, is to be carried into effect, our first inquiry is, What were the main and controlling objects of Mr. Toppan in making his will? A good illustration of this rule is in 3 N. H. 147. *Judge of Probate* v. *Hardy.* Mr. T's will is inartificially drawn, and contains internal evidence of the absence of professional aid or advice, yet in every part two controlling objects are prominent and clearly defined, one of which is a means, the other, an end. They are :—

    I.　The preservation of his entire estate as capital, to the end,

    II.　That his wife might receive a yearly and, as far as practicable, an equal annual income during her life, and his sisters, annuities during their lives, remainder for the benefit of nephews and nieces.

    I. These, in brief, are the general objects of the testator. The other details are intended to be auxiliary to these objects, and such of them as would be hindrances to the accomplishment of a clearly defined object, must be held as subordinate to it. Every part of Mr. Toppan's will affords proof tending to show that he intended the preservation of his whole estate as capital, out of which an income might issue for the benefit of the objects of his bounty. Income only is subject to their uncontrolled use.

    An illustration of his purpose to preserve his property as capital and allow only the expenditure of income, is found in the fact that he followed the legacy, to the Portsmouth Atheneum, of $1000, with an order that it should constitute " a permanent fund," the interest only to be expended for the benefit of the Library. He did this, not because he distrusted the associates and friends of his life-time, but because he would not trust the preservation of his property to the casualties of a change in the government of the Atheneum.

    The same purpose is shown in his legacy, to the Hampton Academy, of $2000. This fund is not only to be invested and the interest only expended, but the trustees must have the certificate of the cashier of a bank in Portsmouth to the soundness of the investment.

    The only specific legacies out of this large estate, which are given, are $500, to Mrs. Charles N. Healey,. and the furniture, fixtures, silver ware, jewelry, watches, clothing, carriages and horses, cows, oxen, live stock and farming utensils, and articles of a like nature, which perish in the using, to his wife. All the rest of the estate is given upon trust, with the undeniable purpose of preserving his property as capital and spending only the income.

    Mr. Toppan died in Oct. 1861. This account was rendered to the court below, May 12, 1863—between which periods, about one year and a half, the proceeds of the shipping (appraised at $29,750) was $17,-643.68, or $11,762 per annum, or about 40 per cent. It cannot be necessary to remind this court that ships are a rapidly perishing kind of

property, or to say that this 40 per cent. is not the income of capital, but is compounded of the consumption and income of capital.

Calculating upon the average chances of life and the average life-time of ships, long before Mrs. Toppan's death—if the ships are transferred to her according to the decree of the court below—the whole capital, $29,750 invested in ships will have been paid to her under the name of income, and all the capital will have taken the form of income, and entirely disappeared, and the testator's obvious purpose of securing to his wife an equal and steady income (the earnings of capital and not by the consumption of the capital itself,) will have been defeated. And his nephews and nieces, for whom the testator ultimately intended the income of one-half the capital invested in shipping, as clearly as he intended the whole income should go to his wife during her life, will be deprived of the income of one-half of $29,750, equal to $14,875, during the terms of their lives. By this process this estate of $80,000 will in a few years be reduced to $50,000, in manifest derogation of the cherished purpose of the testator, and, as I believe, of the legal effect, taken as a whole, of his will.

The case of *Weeks* v. *Weeks*, 5 N. H. 326, and other kindred cases cited to the court below, have no application to this case. In the Weeks case the testator gave his wife less than she was entitled to by law. But this court has never held, when the testator gave his wife for life the income of money or money itself, besides and beyond the amount of her distributive share with limitation over to survivors, that she was entitled to the money itself without security for the benefit of the party entitled to the remainder. In 12 N. H. 164, this court recognizes the general rule in these words : " Where there is a general bequest of a residue for life, with remainder over, the practice is to have the property sold and the proceeds invested."

In England, so carefully do courts guard the rights of the remainder-man, against the person having the life estate in the income, that they will not allow bank stock, the dividends of which may be affected by the will of directors, to remain in trust, but will order it sold and invested in the "three per-cents." Hill on Trustees, 387.

It has long been the established general rule, that, when a testator makes a general gift of his estate or the residue of his estate generally to or in trust for a person for life, with remainder over, so much of the property as consists of interest of a perishable nature must be converted and invested in permanent securities for the benefit of the remainder-man. Idem. 386.

And the same rule applies to articles which *ipso usu consumuntur*. And if, in contravention of this rule, the trustees suffer the tenant for life to receive the whole income arising from perishable securities, he will be decreed to refund what he may have received over and above what he would have received if the conversion had been duly made and proceeds invested in the three per-cents, and the difference will be treated as capital to be invested for the benefit of all parties entitled. The tenant for life, in the first place, is bound to make good the difference, but,

on his inability, the remainder-man may recover it against the trustees, (executors.)   Idem. 387.

All that part of the item in the accounts called " *income from ships*" exceeding 6 per cent. per ann. upon the appraised value $29,750 must be regarded as capital, and be invested under the direction of the court, for whom it may concern under the will—being $14,966.08, or about that sum.   Any thing above 6 per cent. must be regarded in the light of an extraordinary bonus, or an addition to the ordinary annual income of property—or the division or payment of capital under the form of income. Hill on Trustees, 446.

It is settled that an extraordinary bonus or addition to the annual income of stock or other property, which is settled in trust for life with remainder over, must be treated as capital and added to the principal fund. Idem, 386.

The whole current of English authorities shows, that, in a case like this, at least all property which is consumed in the use, must be converted and invested.   The English courts so hold upon the ground that the preservation of the capital for the benefit of the remainder-man is as much an object of the testator, and a duty of the courts, as the securing the annual income to the devisee, who has the life estate.   The capital is to be preserved for whom it may concern, and the courts rigidly prohibit the diminishing of capital under the form of income.   *Brander* v. *Brander*, 4 Ves. 800 ; *Paris* v. *Paris*, 10 Ves. 185, 10 Ves. 288 ; *Witts* v. *Steere*, 13 Ves. 363 ; *Irwin* v. *Houston*, *H. of Lords*, 1802.

II. The balance in the hands of the executors having been converted and invested, if the court shall so order, the next enquiry is, Who is to be the trustee of the property for the life of Mrs. T ?

When the whole instrument is considered together in connection with the rules in relation to such trusts as this will creates, it must result, as I believe, in the transfer to Mrs. Toppan of one-half of the balance, upon her giving security to fulfill the trust upon which it was given her, the payment of the annuities so the testator's sisters, and that the other half must be held by the executors during her life for the purpose of paying the income to Mrs. T. and securing the preservation and transfer of the property to Hackett and Healey as trustees, if it shall be found that this half of the balance may not now be transferred to them, upon all the trusts which appertain to it.

1.   Now, if the decree of the court below is carried into effect, Mrs. Toppan becomes possessor of this half of the balance in the hands of the executors also, in the same way that she receives the half of the balance which belongs to her.

After running the ships (if they escape the pirates) with varying fortunes, in the lapse of time, the ships perish and she dies.   How and from whom are Mr. Toppan's sisters to receive their annuities ?  Which of Mrs. T's heirs, who are already scattered into several jurisdictions, will pay these annuities ?   What security is there for their prompt or ultimate payment ?   Are Miss Mary Chase Toppan and Mrs. Samuel Spauld-

ing to collect their annuities *per capita* from eight or ten different persons in several different States? If one of her heirs dies, are Miss T. and Mrs. S. to seek, at their risk and expense, the quotas which the possibly multiplying branches may owe? Will it be said that the testator's widow will take care of this matter? My answer is that many unexpected events will take place in the lifetime of these persons. Nobody doubts Mrs. Toppan, but her good intentions will not control future events. At her death, with or without a will, her property is exposed to a thousand casualties which she can now neither foresee, control, or guard against.

Now, if any accident befall this unprotected trust property, the following authority shows what would be the position of the appellant:

"Where the trust property consists of stocks or other personal estate, which is necessarily much more within the power of the immediate possessor than real estate, it is unquestionably the duty of the trustees to retain the possession for the benefit of those entitled in remainder; and if they deliver over the funds unprotected into the possession or power of the tenant for life, who disposes of it for his own benefit, they would unquestionably be answerable to the remainder-man for the loss." Hill on Trustees, 385—6.

2. As to the other half of the balance in the hands of the executors, it results, as I believe, from a sound construction of the will and the application of the recognized rules of law, that it should remain in the hands of the executors, to be invested under the directions of the court in trust to pay the income to the testator's wife, and at her death "all" of such balance to Hackett and Healey, trustees. The whole of this balance is given upon two conditions, which, in connection with other provisions of the will, and the decisions of this court, make one-half upon a trust, and the income for life of the other half. The conditions are:

1. That she shall pay $600 to his sisters Mary and Sarah annually.

2. That, upon the death of his wife, the other half shall be held by Hackett and Healey in trust for his nephews and nieces.

The language of "the second condition is that after the death of my wife, one-half of *all* my property (*including the capital invested in ships*) shall be held in trusteeship for the benefit," &c.

It will be conceded, I think, that it is now manifestly the duty of the executors to see that this property is preserved until the death of Mrs. Toppan for the purpose of then being transferred to the trustees.

Now, there are only three methods, within the scope of the will, by which this duty can be performed and this object accomplished:

1. To retain this half of the balance in the hands of the executors, they paying the income to Mrs. Toppan for life, and at her death placing it in the hands of the trustees.

2. To place this half of the balance in the hands of Hackett and Healey, they giving proper security to pay the income to Mrs. Toppan for life, remainder according to the will, &c.

3. To place said half of said balance in the hands of Mrs. Toppan upon her giving proper security, &c.

The will does not make Mrs. T. trustee for this half of his property. The other half is given to her directly charged with a trust. But, of this half, only the income or use is given; this is all the property she has in it. The purpose to preserve "all" this capital is distinctly shown. If the will gives Mrs. Toppan only the income of this half, and if the court give her the possession of the capital, without any security, what legal accountability will she owe, in her lifetime, to Hackett and Healey, as trustees, or to anybody else?

The court below decreed a transfer of this half of the balance to Mrs. T. upon the authority of *Weeks* v. *Weeks*, 5 N. H. 326.

I contend that this court has settled the question, and that all doubts, dangers and disputes will at once be cured in this case, if the court regard the authority of the Judge of Probate against Hardy, 3 N. H. 147. In that case the will ordered that $215,16 should " be paid out of his estate to his daughter Clarissa for her natural life, for her use and improvement—remainder to the children of Clarissa." The court held that the testator intended that Clarissa should have only the income of the legacy for life. And, although the will ordered the legacy to be *paid* to Clarissa, the court held this order was controlled by the manifest intention of the testator and ordered that the executor should retain the fund and *pay* C. the interest for life; and they made this order to preserve the property for the use of C's children. This case is in accordance with the general rule, and is in point.

It is, of course, the duty of the executors, under the direction of the court, to carry into effect the intentions of the testator. The order, " that after the death of his wife one-half of *all* his property shall be held in trusteeship," is just as peremptory and just as important as that the income shall go to his wife for life. And when these objects are carried into effect by the most proper means, the will, as to this half of "all his property," is accomplished. Now, if one half of " all his property is to be passed over to trustees, say 20 years hence, this prominent feature of the will cannot be carried into effect unless the property be preserved. The duty to preserve the property is imperative. Not to take the proper precaution to preserve it, would be as much maladministration as to waste it. The two purposes to which this property is appropriated are not antagonistic, nor is one subordinate to the other, nor is one to be sacrificed at the expense of the other. To have this property less carefully guarded before it it intended to reach the hands of the trustees, than the law will guard it after it reaches them, is to neglect an obvious duty. The testator has placed it in a safe position. Will the law remove it without preserving its safeguards?

Both these objects are to be accomplished, and the first question is, Has the testator indicated any method of accomplishing these two objects? I think he has.

1. Because he has appointed the representatives of these two interests, executors—his wife who is to enjoy the income, and his nephew who is one of the trustees, who is to receive the property at her death; and he intended these two should hold the property for the equal safety and benefit of both objects—that at the moment the interest of one ceased the interest of the other should commence.

2. If the testator has made provision that one party shall have the use of personal property for life, with a limitation over of *all* such property to a survivor, and designates no trustee to hold the property while the life estate is being enjoyed, the law makes the executors trustees, for that term, and Mr. Toppan must be held to have made these provisions in reference to that feature of the law.

3. If the testator's intentions in regard to the disposition of this fund are clear and unequivocal, and the will contains, with regard to this fund, any accessory provisions which might endanger the fulfillment of these clearly defined objects, they are to be disregarded or held subordinate to the indisputable objects, and the law will adopt or appoint trustees in aid of those objects.

In applying the general rule to the construction of this will and the rules of law which regulate the preservation of a trust fund, given for life with a limitation over to survivors, it must, as I think, result:

1. That the shipping of the testator must be sold, and the proceeds, together with all of what is called income from said ships received since his death, after deducting six per cent. per annum on its appraised value, must be treated as capital and invested under the direction of this court, for whom, as capital in contradistinction to income, it may concern.

2. That one-half of the balance in hands of the executors, after such sale and investment and such other sales and investments as the court may upon a view of the property order, be passed over to Mrs. Toppan, upon her giving security to pay the annuities to the sisters of the testator according to the terms of the will.

3. That the other half of such balance be ordered to remain in the hands of the executors, in trust, to pay the annual income to Mrs. Toppan for life, and then to be transferred to and held by Hackett and Healey as trustees.

*Hatch*, for defendant.

The questions to be considered by the court, are, substantially:

(1.) Whether, under the will of Mr. Toppan, his widow, this defendant, is entitled to the possession and custody of the balance found in the hands of his executors, at the settlement of their accounts; and,

(2.) Whether she shall be required to give security for that part of the property in which she has only an estate for life.

I. The will of the testator gives to his "beloved wife *all*" his "property in possession, and all and every contingent interest arising or growing out of any property now in" his "possession, or in expectancy," upon certain conditions. It is difficult to conceive any form of words which would more clearly indicate the intention of the testator to give to her the unlimited control and possession of the property. To leave no doubt about the matter, he adds, that, *after the death of his wife*, one-half of his property shall be held in trusteeship to certain uses. It would be an abuse of the English language, to attempt to reconcile with these words,.

the idea of any intention to place the property in the hands of any other trustee than the wife during her life.

The evident intention and the legal effect of the will is to give one-half of the estate to the defendant absolutely, subject to deductions on account of the minor legacies. There is a slight obscurity in the will on this point, arising from the inartificial manner in which it is drafted; but careful examination can lead to no other construction. The whole property is given to the defendant subject to certain small legacies, and to two conditions: (1.) The payment of annuities to Miss M. C. Toppan and Mrs. Spaulding. (2.) That, after the death of the defendant, one-half of the property shall be held in trust, to be disposed of as follows: (a.) Certain real estate to C. G. Toppan. (b.) The remainder of the half of the property left after the decease of the defendant, to be managed gratuitously by trustees, the annual income to be paid to the nieces and nephews of the testator, and the principal (half) to the "last survivor of them." At first sight, ambiguity may seem to be caused by the use of the word "remainder;" but the word evidently refers to the "one-half of all my property," which the preceding clause provides shall pass into the hands of trustees after the death of the testator's wife. The testator, when he uses the word "remainder," is speaking of that half of the property; he gives part of that half to C. G. Toppan, and, in the second paragraph, disposes of the "remainder," speaking of it as the share that is to be held by trustees. A different construction would be at variance with every part of the will, and would be contrary to the rule which requires that bequests to wives shall be liberally and favorably construed. *Weeks* v. *Weeks*, 5 N. H. 328; *Porter* v. *Tournay*, 3 Vesey 312.

As to the remainder of the property, if it were merely given to the defendant for life, with remainder over, she would be entitled to the possession, and without giving security.

Such is the established rule of the English Chancery, and in New York, Massachusetts, and, it is believed, all other jurisdictions where our system of jurisprudence prevails. See *Foley* v. *Burnell*, 1 Brown's C. C. 274, 279; 1 Story's Eq. Jur. sec. 604; 1 Jarman on Wills, 794; *Covenhoven* v. *Shuler*, 2 Paige Ch. Rep. 122, 132; *Homer* v. *Shelton*, 2 Met. 196, 205.

This principle has been adopted in this State, and has been repeatedly sanctioned by our courts. See *Weeks* v. *Weeks*, 5 N. H. 326; *Marston* v. *Carter*, 12 do. 159, 163; *French* v. *Hatch*, 28 N. H. 353.

The reasons, upon which this rule is founded, seem strongly applicable to the present case. The legatee is the *widow* of a testator, (*Weeks* v. *Weeks*, 5 N. H. 328,) who left no descendants, and no relatives nearer than nephews and nieces. He has expressed, in unequivocal terms, his intention to trust her, (*do. and Homer* v. *Shelton*, 2 Met. 205.) And, by giving her half his property absolutely, he has endowed her with pecuniary responsibility sufficient to secure the preservation of the remainder, till the trustees shall be entitled to take it. Moreover he has imposed upon the defendant the duty of paying the an-

nŭities to his sisters, out of the income of his estate (*case,* p. 1) ; she cannot perform this duty unless she may control the property.    And if he had intended that the income of his property only should go into the possession of his wife, he would have framed the closing sentence of the second paragraph in the will (*case,* p. 2) so that, in the case there contemplated, $500 per annum should " *be paid*" to his wife, and the balance (not exceding $600) to his sisters.

The testator, desiring to give half his property to the use of his nephews and nieces, after the decease of his widow, must necessarily invest it in the hands of some person for safe keeping ; why should he not select his wife for this trust as well as any other person?    He must be presumed to know that the law would give it to her, without security, unless he required it.    Taking into consideration the age, capacity, education and integrity of Mrs. Toppan, and her connections, with all which the testator was intimately acquainted, is it probable that the property will be less safe in her hands than in the hands of those who claim to be trustees?    " If property were never lost by wise and intelligent men, there might be some foundation for such an apprehension," (2 Met. 204.) But the testator, who was chiefly interested, in full view of the law, has determined this question for himself, and it would be an act of violence to his will, and would place his widow in a different condition from that which he intended, to withdraw the property from her hands, or to require her to embarrass herself by giving sureties.

The testator has shown his confidence in his wife, by making her one of his executors, by entrusting to her the payment of the annuities to his sisters, by leaving all his estate (except the small legacies,) in her hands for her life ; he has manifested his affection for her by giving her outright nearly one-half of his property, and the use and possession of the other half for life, and postponing all other legacies until a sufficient income and support is assured to her ; and, though the idea of placing part of his estate in the hands of trustees was in his mind, he carefully abstains from giving them any control of the property until " after the death of my wife," and he does not charge them with the trust until a time when their interest in the income of the property would make them willing to take charge of it gratuitously.

It seems to be assumed by the appellant, that the annuities to the sisters of the testator are to be paid exclusively out of that half of the estate which is given to the widow absolutely.    We do not admit this to be the true construction of the will ; but if it be so, the anxiety of the appellant about the payment of the annuities after the decease of Mrs. Toppan seems almost ludicrous.    Upon the construction claimed, the annuities will, at the decease of Mrs. Toppan, become a charge upon her estate payable by her administrator, like any other debt.    The giving of security for the other half of the estate, which is to pass into the hands of trustees at the decease of the defendant, would afford no additional protection to the annuitants, and could relieve them from no trouble. If our construction be correct, that the annuities are chargeable upon the whole estate, they are to be paid by Mrs. Toppan, so long as she lives, in accordance with the literal direction of the testator (*case* p. 1,) and,

after her decease, half by her administrator and half by the trustees. But the annuitants ask no security, and the appellant has no right to demand it for them.

In the consideration of this case, it is to be remembered also, that, in the case of a life estate in chattels, a court of equity only has power to require the tenant to give security to the remainder-man, and that only upon allegation and proof of waste or danger of waste of the property. 1 Story Eq. Juris. sec. 684; 1 Jarman on Wills, 794; *Dewitt* v. *Schoonmaker*, 2 Johns. 246; *Homer* v. *Shelton*, 2 Met. 206, and cases before cited.

In the present instance, there is no allegation or proof that the property will be unsafe in the hands of the defendant, nor is this the proper proceeding by which security may be required of her. The Court of Chancery is always open to the appellant, and, through its agency, upon a proper case made, he may at any time be heard as to the security he asks for.

II. The claim of the appellant, that the shipping of the testator shall be treated as a subject distinct from the rest of the estate, is unfounded in view of any law or usage with which we are acquainted.

Both the accountants charged themselves with the amount of the inventory of the personal estate, in which ships are included at their appraised value; which must, in the absence of any suggestion to the contrary, be taken to be the true value. Upon this basis, the account of the defendant was made up as allowed by the Judge of Probate. The balance of the account, thus made up, indicates exactly the amount of the estate, half of which is bequeathed to the nephews and nieces of the testator after the decease of the defendant. It is not material of what items this amount is made up, whether money, stocks or ships, or any other chattels; the balance, or so much of it as belongs to other parties, is what the estate of the widow must ultimately account for. *French* v. *Hutch.* 28 N. H. 353. There is nothing in the will which indicates a desire of the testator to preserve the personal estate in any specific form; and, in view of the difficulties suggested by the appellant, it would hardly be practicable to keep up the shipping as such.

If the ships were appraised at too low a rate, any party interested might have applied to the Judge of Probate to charge the executors with the true value of them. No such motion having been made, the ships must be taken, according to the usual practice of our Probate Courts, to have been sold to the executors at the appraised or inventory value. At that value, the defendant is entitled to the whole income of them for her life; and the suggestion, that property of this kind pays large nominal dividends at the expense and gradual absorption of the capital invested in them, has nothing to do with the present question. If, after the decease of Mrs. Toppan, her administrators shall claim that she received the property specifically, and that her estate shall have the benefit of the income actually earned by it, the proper tribunal will determine what sum this may be. But, in the meantime, the widow is justly entitled to the fair income of the property represented by the ships, which, together with the " dividends of stocks and rents of real estate accruing since the

decease of the testator," the account presented by the appellant wholly denies to her.

It will be observed that the appellant specifies, in fact, but two reasons of appeal :

(2.)   "Because the Judge of Probate has ordered the shipping of the testator to be transferred to his widow, instead of the money for which said shipping could be sold ;"

Which is untrue in fact, because the executors are charged with the whole amount of the inventory, including the ships as there appraised, which is to be taken to be their sale value ; and

(3.)   "Because the Judge of Probate has ordered the entire balance in the hands of the executors to be paid to the widow of the testator without requiring her to give any security for the fulfillment of the several trusts upon which said property was devised."

The remainder over after the life of Mrs. Toppan for the benefit of the nephews and nieces, cannot be called a trust.   The annuities to the sisters are not trusts, but conditions accompanying a legacy.   And the Judge of Probate has not "ordered" any "balance" "to be paid to the widow," but simply allowed an account in which that balance is assumed to have been paid.   The first reason of appeal is vague and not such as the statute requires.   So that, in fact, regarding solely the reasons of the appeal, which are the only matter properly before the court, the appellant states no case upon which he is entitled to be heard.   Not waiving this objection, which seems fatal to this proceeding, the defendant has been content to argue this appeal, as if the question, whether the widow of Mr. Toppan is entitled to the possession of his whole estate without giving further security, were fairly before the court, believing that the plainly expressed intention of the testator is accordant with the established rule as stated in *Weeks* v. *Weeks*, and that this court has neither power nor inclination to modify the will of the testator, as is desired by the appellant.

SARGENT, J.   The testator first gives and bequeaths to his wife, "all my property in possession and all and every contingent interest arising or growing out of any property now in my possession or in expectancy," subject to the following conditions :   First, that his wife should pay the sum of six hundred dollars per year to the testator's two sisters, during their lives and the life of the survivor ; and, *second*, that, after the death of his wife, one-half of all his property should be held in "trusteeship," (the trustees to be named in the will,) to be disposed of in the following manner :—His farm in Hampton is to be for the use of Christopher Grafton Toppan, during his life, then to his son, &c., and, in default of such son, to Hampton Academy, if then in existence and in active operation ; but if not, then to the Congregational Society in Hampton. "The remainder of my property being personal, with some real estate situated in the city of Portsmouth, the income arising therefrom shall be equally divided and paid to all my nephews and nieces, yearly, so long as they or any of them may live ; and the last survivor of them shall be the receiver of all the property held by my trustees for their account."

There might at first be doubt whether the testator, after disposing of his farm, in speaking of the remainder of his property, did not mean all the rest of his property. But, taken in connection with what precedes and follows, it must be held to refer to the remainder of the half which he had provided should go into the hands of trustees for the benefit of his nephews and nieces.

In the third article in the will, the testator gives to his wife " all the furniture, fixtures, silver ware, jewelry, watches, clothing, apurtenances, carriages and horse, if any I own, in the city of Portsmouth, cows and oxen, live stock, and farming utensils, either at Hampton or Portsmouth, and any property on my place in Hampton, either in the house, barns, corn-house, wood-house, or sheds, or in any of the out-houses, considered as personal property," for her sole use and benefit; and he provided that said property should not be taken into account as any part of the estate for which his wife was to be in any way responsible; nor was it to be reckoned in ascertaining the amount of his property, unless it became necessary to do so that it should amount to such a sum that the annual income of it all might be eleven hundred dollars ($500 for his wife and $600 for his sisters.) In that event only it was to be included in ascertaining the whole amount of his property. When thus included, if all his property should be so small, that, after paying debts, the income of it all would not be over five hundred dollars, with her house rent, then she was not to pay anything to the testator's sisters. But if the income of all his property should exceed five hundred dollars besides the house rent, and not be sufficient to pay the whole six hundred dollars to his sisters, then they were to be paid a proportional part of said sum.

But the estate proves to be of sufficient amount after paying all debts, so that this property, thus specifically given to the widow, does not need to be included in making up the amount of the estate, for which, or for the income of which, the widow is to be in any way or at any time responsible. For the same reason, the two thousand dollars, bequeathed to the Hampton Academy, in the *fourth* article in the will, and the one thousand dollars to the Portsmouth Atheneum, in the *sixth* article, both of which are given on condition that the estate should exceed a certain amount, became absolute bequests, and have been properly paid by the executors. The five hundred dollars given to Sarah P. T. Healey, in the *seventh* article in the will, was an unconditional bequest, and has also been properly paid by the executors. The inventory shows that there was live stock and produce, such as corn, potatoes, hay, oats, &c., to the amount of $578; farming utensils to the value of $75; household furniture at Portsmouth $3000, and at Hampton, $300; making in all $3953,00—all of which is specifically given to the widow. All that the executors, as such, have to do with this property, is to have it inventoried, and deliver it over to Mrs. Toppan, taking her receipt therefor, and this will be the end of their responsibility for this property.

Now, since the amount of the testator's property, without including the articles specifically bequeathed to his wife, is known largely to exceed the sum of $50,000, after paying all debts, let us see what is the

construction to be given to the will, and what are its substantial provisions, stated in the order in which such provisions are usually placed in instruments of this kind.    Omitting the conditions dependent upon the amount of his property, and the will provides :

1.    For the payment of debts.

2.    For the payment of a legacy of five hundred dollars to Sarah P. T. Healey.

3.    It gives certain specific articles of personal property to Mrs. Toppan for her sole use and benefit.

4.    It gives a legacy to Hampton Academy of two thousand dollars.

5.    It gives a legacy of one thousand dollars to the Portsmouth Atheneum.

6.    It gives to his wife all the rest, residue and remainder of all the testator's property in possession, and all and every contingent interest arising or growing out of any property then in his possession or in expectancy, subject to two conditions which have already been stated.

In any view that can be taken of the will, the result is the same in regard to the bequest to the wife, she is residuary legatee of all his property that shall remain after the payment of debts and the legacy of five hundred dollars, and the gift to the wife of specific articles, in one event ; and, in another, it is what should remain after deducting these, and, also, the legacy to Hampton Academy and to the Portsmouth Atheneum. And it is not a bequest of any particular property specifically, but of all his property in possession or in expectancy, or the residue of it all.

Now, it is a rule of long standing, and well established, in the English Court of chancery, that, where a testator makes a *general* gift of his estate or the *residue* of his estate generally to, or in trust for, any person for life, with remainder over, so much of the property as is of a perishable nature must be converted and invested in permanent securities for the benefit of the remainder-man, and the tenant for life shall have only the income arising therefrom.    The same rule applies to articles *quæ ipso usu consumuntur*, such as corn and other provisions, wines, fruits, live stock, and the like, when such articles, instead of being specifically bequeathed, are included, with other property, in such a general gift of all, or the residue of all the testator's estate generally, to one for life, with remainder over.

But the rule is different where the bequest is of specific articles to one for life, with remainder over.    There the tenant for life is entitled to the possession and use of the property ; and, should the article be worn out, or damaged, or wholly destroyed, during the life estate, the remainder-man has no remedy.    When, therefore, there is such a specific bequest of articles which perish in the using, such as corn, wine, &c., then the whole title and property is ordinarily held to rest in the tenant for life, as there could ordinarily be nothing remaining of the specific property for the person in remainder.    Therefore, such a specific bequest of such articles as *ipso usu consumuntur*, to one for life, with remainder over, is treated as an absolute gift to the tenant for life.    And still it might happen otherwise ; because, if the tenant for life should suddenly die before

the provisions were consumed or the other property had perished in the using, such as remained would go to the remainder-man, and not to the heirs of the tenant for life.

This distinction between bequests of specific articles of property, and general bequests of all or of the residue of all the testator's property generally, was not noticed in the earlier decisions.    In fact, in the earlier English cases, the bequests were generally of specific articles, such as silver plate, sets of pearls, household furniture, or the like, where the question raised was whether the tenant for life should be compelled to give security to the remainder-man for the property at the close of his term ; and after some conflict it was settled that no such security should be required ; that an inventory of the property was all that could be demanded ; that the tenant for life was entitled to the possession and use during his life, and if the property depreciated in value there was no remedy to the remainder-man ; and that, when such articles were specifically given as perished in the using, then, of necessity, the tenant for life had an absolute property, and was not accountable to the remainder-man. *Hyde* v. *Parratt*, 1 P. Wms. 1 ; *Upwell* v. *Halsey*, 1 P. Wms. 651 ; *Hastings* v. *Douglass*, Cro. Car. 343 ; *Wilkinson* v. *South*, 7 Term. R. 553 ; *Smith* v. *Clever*, 2 Ver. 59 ; *Clarges* v. *Albemarle*, 2 Ver. 245 ; *Slanning* v. *Style*, 3 P. Wms. 334 ; *Foley* v. *Burnell*, 1 Brown's Ch. 279 ; *Randall* v. *Russell*, 3 Meriv. 194 ; *Leeke* v. *Bennett*, 1 Atk. 471.

But, in *Howe* v. *Earl of Dartmouth*, 7 Ves. 137, it was settled as the rule, that, where a bequest of personal property was not specific, but was a general gift of all such property, or of the residue of such property generally, to a person for life, with remainder over, and where such general bequest includes perishable property, the object of the testator can only be effected by converting such property into permanent annuities, and giving each person in succession the dividends of the fund. This rule has been recognized and adopted in *Fearns* v. *Young*, 9 Ves. 549 ; *Dimes* v. *Scott*, 4 Russ. 195 ; *Bethune* v. *Kennedy*, 1 Myl. & C. 114 ; *Alcock* v. *Sloper*, 2 Myl. & K. 699 ; *Collins* v. *Collins*, 2 Myl. & K. 703 ; *Mills* v. *Mills*, 7 Sim. 501 ; *Pickering* v. *Pickering*, 2 Beav. 31 ; S. C. 4 Myl. & C. 298 ; *Litchfield* v. *Baker*, 2 Beav. 481 ; *Benn* v. *Dixon*, 10 Sim. 636 ; *Goodenough* v. *Tremamondo*, 2 Beav. 512 ; *Hunt* v. *Scott*, 1 De G. & Sm. 219 ; *Neville* v. *Fortescue*, 16 Sim. 333 ; *Pickup* v. *Atkinson*, 4 Hare, 624 ; *Cafe* v. *Bent*, 5 Hare, 36 ; *Vaughan* v. *Buck*, 1 Ph. 75 ; *Daniel* v. *Warren*, 2 Y. & Coll. C. C. 290 ; *Burton* v. *Mount*, 2 De G. & Sm. 383 ; *Johnson* v. *Johnson*, 2 Coll. 441 ; *Bowden* v. *Bowden*, 17 Sim. 65 ; *Litchfield* v. *Baker*, 13 Beav. 447 ; *Morgan* v. *Morgan*, 14 Beav. 72 ; S. C. 7 Eng. Law & Eq. 216 ; Hill on Trustees, 386 ; 2 Leading Cases in Equity, (3d Am. Edition,) 514 ; *Hood* v. *Chapham*, 19 Beav. 90 ; *Jeb.* v. *Tugwell*, 20 Beav. 84 ; *Blann* v. *Bell*, 5 De G. & Sm. 658.

In *Morgan* v. *Morgan supra*, it is said that the rule, as laid down in *Howe* v. *Earl of Dartmouth*, is correct and will prevail, unless there can be gathered from the will some expression of intention, that the prop-

erty is to be enjoyed *in specie*, and which it is incumbent on those contesting the application of the Earl, to point out; and that modern cases allow small indications of intention to prevent the application of the rule, but the mere absence of any direction to convert the property is insufficient.

In *Cafe* v. *Bent supra*, it is said that the general rule, as to the conversion of wasting property, does not proceed on the assumption that the testator intended his property to be sold, but upon this, that the testator has intended the enjoyment of perishable property by different persons in succession, and this the court can accomplish only by a sale. See also remarks of Lord Brougham in the House of Lords, to the same effect, in *Pendergast* v. *Pendergast*, 3 H. L. Cases, 195.

The distinction between a specific and a general or residuary bequest or gift of chattels, is not only thus established in England, but is fully recognized in the United States. Where there is a specific gift of articles, *quæ usu consumuntur*, as hay, corn, wine, provisions, &c., for life, with remainder over, the remainder is ordinarily void, at least, where the tenant for life lives to consume it all, and the first legatee takes absolutely. But where such specific gift is of articles which are not consumed by use, but are only deteriorated, or wear out, such as furniture, plate, and farming utensils, the remainder is good; but the tenant for life is entitled to the possession and use of the articles, and is not required to give security, but only to file a schedule of them for the benefit of the remainder-man. 1 Story's Eq. Juris. sec. 604; *Weeks* v. *Weeks*, 5 N. H. 326 and cases. But the remainder-man may have security ordered in such cases, where it is shown that there is real danger that the property will be wantonly wasted, or fraudulently secreted or removed. 2 Kent's Com. 354; *Homer* v. *Shelton*, 2 Met. 194; *Hudson* v. *Wadsworth*, 8 Conn. 348; *Langworthy* v. *Chadwick*, 13 Conn. 42.

The early cases in this country were cases of specific bequests, or the principles applicable to that class of cases were applied to them, without noticing the distinction, *Gillespie* v. *Miller*, 5 Johns. Ch. 21; *Westcott* v. *Cady*, 5 Johns. Ch. 334; *De Witt* v. *Schoonmaker*, 2 Johns. 243; *Weeks* v. *Weeks*, 5 N. H. 326. The general principle applicable to that class of cases is also stated in 2 Kent's Com. 354, and the Chancellor then adds: "Where there is a general bequest of a residue for life, with remainder over, the practice now is to have the property sold and converted into money by the executor and the proceeds safely invested, and the interest thereof paid to the legatee for life." And he cites *Howe* v. *Earl of Dartmouth*.

This same distinction was soon made in New York, and the principle of *Howe* v. *Earl of Dartmouth* was introduced and distinctly adopted in the courts of equity in that State. *Covenhoven* v. *Shuler*, 2 Paige, 132; *Williamson* v. *Williamson*, 6 Paige, 298; *De Peyster* v. *Clendennin*, 8 Paige, 295; *Cairns* v. *Chaubert*, 9 Paige, 160; *Spear* v. *Tinkham*, 2 Barb. Ch. 211. Also, in Pennsylvania, *Kennard* v. *Kennard*, 5 Watts, 108; *Eeichelburger* v. *Barnetz*, 17 S. & R. 293. So, in Tennessee, *Henderson* v. *Vaulx*, 10 Yerger, 30;

*Woods* v. *Sullivan*, 1 Swan, 507.   And also in Maryland, *Evans* v. *Inglehart*, 6 Gill & J. 171; *Wootten* v. *Burch*, 2 Md. Ch. 190. And in Alabama, *Harrison* v. *Foster*, 9 Ala. 955.

The same principle has been recognized in this State, though we are not aware that the question has ever arisen directly, or been decided before.   In *Marston* v. *Carter & Tr.*, 12 N. H. 164, which was a case of a specific bequest of certain household furniture, and the plaintiff was claiming to hold this furniture by virtue of the trustee process, upon the debts of the husband of the tenant for life, and it was contended, that, if the property itself could not be holden absolutely, yet the *use* of it could, and that the use, during the life of the tenant for life, should be sold, *Parker, C. J.* says:   "If creditors could reach it (this furniture) in any way, it would seem to be by proceedings in equity, resulting in the sale of the property itself, an investment of the fund for the benefit of those interested, and a payment of the income to the creditor during the existence of the life estate.   Whether that can be done in the case of a *specific* bequest of the use of a chattel, we need not now inquire.   Where there is a general bequest of a residue for life, with remainder over, the practice is to have the property sold and the proceeds invested.   *Vide* 2 Kent's Com. 354 and notes."

We think the general principle followed in *Howe* v. *Earl of Dartmouth*, and the subsequent English cases, should be fully adopted in this State, as it has been by the courts in this country generally, although the instances requiring its application are much fewer with us than in England.   It has become well settled here, that, where there is a pecuniary or a residuary bequest for life, with a limitation over, the executor will be bound to protect the interests of those in remainder, by requiring security from the legatee for life, or by converting the fund into cash and investing it for the benefit of all who are entitled under the will.   This general rule, which is designed simply to give effect to the intention of the testator, will, however, yield wholly or in part whenever he manifests an opposite or different intention, or when it cannot be applied without defeating the purposes of the bequest.   Where money, or property meant to be converted into money, is bequeathed, there is no hardship in requiring security before payment or delivery to the legatee, because, if he is unable to give security, the object of the testator may be equally well attained by investing the fund and allowing him to receive the interest.   But when books, furniture, or other specific chattels, are specifically bequeathed by will, the presumption is, that the testator intended that they should be used by the legatee in the form in which they were given; and, as they must be delivered to him *in specie*, in order to effectuate this intention, security will not be required, because requiring it would defeat the bequest in case the legatee were unable to give it.   In such cases, only an inventory is required.

But it is said that the presumption of equity is so strongly against a course which necessarily interferes with the equalization of the bequest between the legatee for life and those in remainder, by compelling the latter to take the property subject to the deterioration which it has undergone by the lapse of time and by use, that, when specific chattels, in-

stead of being given specifically, form a part of a general residuary bequest for life, with limitations over, the object of the testator will be presumed to have been to give the first taker the mere interest on the fund, and the executor will be bound to convert the whole into cash and either invest it for the purposes of the will, or pay it over on receiving security for the principal as in case of a pecuniary legacy.

In *Covenhoven* v. *Shuler*, 2 Paige, 122, after stating the rule applicable to a specific bequest of certain articles, the Court said : " But none of these principles in relation to specific bequests of particular articles, whether capable of a separate use for life or otherwise, are applicable to this case.    Where there is a general bequest of a residue for life, with a remainder over, although it includes articles of both descriptions, as well as other property, the whole must be sold and converted into money by the executor, and the proceeds must be invested in permanent securities, and the interest or income only is to be paid to the legatee for life. This distinction is recognized by the Master of the Rolls in *Randall* v. *Russell*, 3 Mer. 193.    He says, if such articles are included in a residuary bequest for life, then they are to be sold and the interest enjoyed by the tenant for life.    This is also recognized by Roper and Preston as a settled principle of law in England.    Prest. on Legacies, 96 ; Roper on Leg. 209.    See also *Howe* v. *Earl of Dartmouth*, 7 Vesey, 137, and cases in notes."

Let us, then, examine the will before us, with a view to learn the intentions of the testator.    We are not so much to follow any particular words or phrases, as to gather from the whole the testator's real intent. Thus we have already seen that the provisions of the will, by which the property is given to the widow in part for life, and in part in fee, is really a residuary bequest.    At her decease, one-half the testator's property goes to trustees ; but should his sisters outlive his widow, their annuity is to be paid during their lives, and, of course, after the decease of the widow, it must be paid from her estate, which would be her half of the whole.    One-half the property being given to her, subject to the payment of the annuity, is simply charging that annuity upon her half of the property, during the lives of the sisters, with remainder to herself in fee. It is so held in *Howe* v. *Earl of Dartmouth*, where the same words " subject to" are used.

We find a similar case in *Slanning* v. *Style*, 3 P. Williams. 334, where, the testator, in his will, having charged the residue of his personal estate with £40 per annum to his wife, to be paid quarterly, the executor was ordered to bring before the Master sufficient in bonds and securities to be set apart to secure this annuity.    Here the widow may die before the testator's sisters, and should she spend her half of the property, which is possible, then the other half going to the trustees at her decease, the sister's annuity would fail unless some security were given.

We think, that, in order to carry out and secure the performance of the testator's wishes and intentions, the executors should set apart an amount of stock or bonds sufficient to meet this annuity from the income ; and that thereupon the balance of one-half of the whole estate, after

deducting what is specifically given to the widow, be paid over to her by the executors; all which half is to be taken from the personal property and the avails thereof, unless she choose the real estate in Portsmouth as a part of it. It is evident that the testator intended the farm in Hampton should go to the trustees as a part of their half, from the disposition which he directs them to make of it. We find nothing in this will to indicate that the testator did not intend that the general rule should apply, that whatever property is of a perishable nature, so that the interest of the remainder-man in the same would not be equal by the year to that of the tenant for life, shall be disposed of and the amount invested in permanent funds or securities, and that the tenant for life receive the income thereof during her life.

There is nothing in the fact, that real and personal estate are bequeathed together at the same time, and that it is evident that the testator intended the real estate, or, at least, the Hampton farm, should remain unsold, and be enjoyed *in specie*. That is one of the points decided in *Howe* v. *Earl of Dartmouth*, viz: That a bequest or devise of real estate for life, with remainder over, is always to be treated as a specific devise, of which the tenant for life is to have the use, possession, and income during life; but that a bequest of personal property will not be held to be specific, merely from being combined with a devise of land.

But, in this case, the testator gives to his wife all his property in possession, and all and every contingent interest arising or growing out of any property now in his possession or in expectancy, subject, &c. Now, here is not only nothing to show that the bequest was intended to be specific, but the general form of it, giving all his property, &c., and the fact, that he afterwards selects out a portion which he enumerates, and gives to her specifically, shows that he did not consider the first bequest specific, or intend that it should be; also his specifying that all and every contingent interest in possession or in expectancy should be hers, shows that he did not expect or intend that these things were to be specificially enjoyed by her for life in the condition they were then in, but that these interests should be converted into something substantial and permanent, capable of furnishing income or interest as capital.

Applying the rule, then, in *Howe* v. *Earl of Dartmouth* to this case, it seems to us plain that the shipping should be converted into money, and the avails invested in permanent securities. These ships may last many years. Ordinarily, they earn money fast while they are prosperous, but are likely to be of short continuance. The casualties to which they are exposed are so numerous and so great, that the chances are, that many, if not all, of them would perish during the life estate. Let the executors convert this property into permanent, interest-bearing securities.

As to the amount of profits realized from the shipping, being $17,643.68 for about 18 months, or nearly $12,000 a year, on a capital of $29,750, at its appraised value, it is evident that if the tenant for life is to have that amount as income merely, she will fare infinitely better than those in remainder. She will be likely to get not only large income, but to wear out or use up the principal, during her life, and thus

get the whole of the principal and interest herself, and leave nothing to those in remainder. The principle to govern in this regard is stated in *Howe* v. *Earl of Dartmouth* : " As in the one case that in which the tenant for life has too great an interest is melted for the benefit of the rest, in the other that of which, if it remained *in specie,* he might never receive anything, is brought in, and he has immediately the interest of its present worth." So that, on the same principle, a personal annuity not to commence, in enjoyment, till the expiration of twenty years from the death of the testator, and even then payable on a contingency, this future interest, for the sake of the tenant for life, should be converted into a present interest in order to yield an immediate income to the tenant for life.

In *Fearns* v. *Young,* 9 Ves. 549, the testator bequeathed to his wife the interest or income of one-half of his property for life, with liberty to dispose of half of said half, and the other half of that half, at her decease, to his daughter, and the whole of the other half to his daughter. The testator had an interest in a partnership which had thirteen months to run after his decease, and his share of the profits during that time amounted £2070, 13s, payable, one-half in one year and the other half in two years after the termination of the partnership : *Held,* that the wife was not entitled to one-half of this sum, as income, but that this amount was to be treated as capital, that the interest should be sold for its present worth, and the wife receive half the income of that fund as interest, which would make the interest of the tenant for life and the remainder-man equal by the year. "The rule," said Lord Eldon, "as to personal estate is,that what is not specifically given and consists of an interest wearing out, or an interest at present saleable, but, in point of enjoyment, future, the whole is converted into money in a question between the tenant for life and the remainder-man." Each thus shares equally in the interest. *Cairns* v. *Chaubert,* 9 Paige, 160, is also a strong case in point.

All the profits or income of the shipping since the testator's decease, together with all the avails of the shipping when sold, are to be invested as capital, after paying the wife a proper amount of interest upon the clear principal during the process of administration. Also the advance in the Columbus, Piqua and Indiana R. R. bonds was properly accounted for as principal by both the executors. Mrs. Toppan cannot take the shipping or any other property at the appraisal and account for it at that sum, as tenant for life of the property. The executors might have done this in ordinary cases, but they have not done it in this case. Neither of the accounts as rendered attempts or claim this. This case does not stand any differently from what it would if the executors were indifferent or disinterested persons. They will settle the estate as though neither of them had any interest in the avails of the property, and pay over to the widow as directed.

The half that is to go to the trustees, at her death, may be held by the executors in trust to be safely invested in permanent interest-bearing securities, for the benefit of the estate ; the income to be paid to her, and the stock at her decease to go to the trustees. Where moneys are re-

ceived as the proceeds of what are termed wasting securities, such as leasehold estates which in progress of time will expire, or perish, or become of greatly diminished value, if the funds are held on a trust by which the income is to be paid for life to certain persons, and, on their decease, the remainder is given to other persons, it will be the duty of the trustees to add such dividends or moneys to the principal fund, so as to preserve it unimpaired for those entitled in remainder. *Balch* v. *Hallet*, 10 Gray, 402, and cases cited; *Kinmonth* v. *Brigham*, 5 Allen, 271.

The question arises as to the amount which the tenant for life is to receive as interest or income while the estate is in progress of settlement; for, during this period, the income and dividends are to be received by the executors and charged to them in their account; and when they settle with the tenant for life, some rule must be adopted as to the amount which she is to receive upon all the personal property found in the executor's hands. Now, some of this property may have paid four, some five, some six, and some eight per cent., and some, like the shipping, may have made forty per cent., but much of that amount at the expense of a large depreciation in the capital. All this capital and income is to be charged to the executors, or rather they are to be charged with all this income and with the amount the shipping sells for, and for all the other property, and upon this whole sum, as capital, the tenant for life should receive such an income as will make it worth the same to her annually that it will be worth to the remainder-man.

We find the English decisions are not uniform on this point; some holding that the tenant for life is entitled to nothing till the expiration of a year from the time of the testator's death, *Stott* v. *Hollingworth*, 3 Mad. 161; others, that such tenant for life during said year will take the income of such parts of the estate as are properly invested at the testator's death, or may become so invested during that year, *La Terrier* v. *Bulwer*, 2 Sim. 18; others still, that the tenant for life is entitled to the income of the property in its existing state during the first year from the testator's death, *Angerstien* v. *Martin*, Turner & Russell, 232, and *Douglass* v. *Congreve*, 1 Keen, 410. But the late cases settle, that the tenant for life is entitled to the amount of the dividends on so much three per cent. stock as would have been produced by the conversion of the property at the end of that year. *Dimes* v. *Scott*, 4 Russ. 209; *Taylor* v. *Clarke*, 1 Hare, 161.

But in *Williamson* v. *Williamson*, 6 Paige, 298, 304, *Chancellor Walworth*, after examining the English cases at some length, says: "The result of the English cases appears to be, and I have not been able to find any in this country establishing a different principle, that, in the bequest of a life estate in a residuary fund, and where no time is prescribed in the will for the commencement of the interest or the enjoyment of the use or income of such residue, the legatee for life is entitled to the interest or income of the clear residue, as afterwards ascertained, to be computed from the time of the death of the testator."

And in that case it was held that the executors should pay the tenant for life five per cent. upon the clear residue, after deducting debts, leg-

acies and expenses, from the death of the testator. We think the same rule may be applied in this case, with justice to all concerned. The result is, that the executors will proceed to dispose of the shipping to the best advantage they can, will charge themselves with all the income or earnings of the same, and all the avails thereof, also with all the money received on all bonds as principal, and with all interest, income or dividends from and upon all stocks, bonds and securities, and money received, and with all the stocks which they find properly invested,—and, if any are not so, they must dispose of any such, and account for the amount received,—must charge themselves with the amount of real estate and of money collected on notes and accounts, with the cash on hand and rents of real estate, in fact, with everything they receive from the estate.

They will credit themselves with paid funeral charges, all debts of the deceased with interest as paid, paid for insurance, for repairs of shipping, taxes, all legacies, annuities and expenses of administration, and any other moneys properly paid out, and they are to deliver to Mrs. Toppan all the property specifically bequeathed to her, and discharge themselves from liability for it by her receipt for the same. All this, deducted from the whole amount received by them, will leave the whole balance of principal and interest or income thereon up to time of settlement. From this balance deduct five per cent. per annum upon the clear *principal* thus found in their hands to be computed from the death of the testator, and when that amount is deducted from the whole balance in their hands it will leave the net amount for distribution.

Of this amount one-half is to be taken, and, after setting aside and safely investing enough of the same to produce a yearly income of six hundred dollars for the testator's sisters during their lives, the balance is to be paid over to Mrs. Toppan. The amount thus set aside to produce the annuity of six hundred dollars, will belong to Mrs. Toppan at the decease of the testator's sisters, or if they should survive Mrs. Toppan, then at their decease it will go to her legal representatives.

The other half, including the Hampton farm, is to be held by the executors in trust, to see that said farm is appropriated as the will directs; and to see that all of said half, except the farm, is safely invested, and the income paid annually to Mrs. Toppan during her life; and, at her decease, to deliver the same to the trustees appointed in the will.

To ascertain the clear principal, find the sum which, put at interest at five per cent. during the time occupied in settling the estate, will produce the balance in the executor's hands, upon settlement. It is simply having the time, rate per cent. and amount given to find the principal.

*Decree of the Probate Court reversed.*